COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF the IOWA STATE BAR ASSOCIATION, Complainant,

v.

N. B. (Mike) WILSON, Respondent.

No. 61687.

Supreme Court of Iowa.

March 19, 1980.

·Lee H. Gaudineer, Jr., and Hedo Zacherle, Des Moines, for complainant.

Theodore T. Duffield of Patterson, Lorentzen, Duffield, Timmons, Irish & Becker, Des Moines, for respondent.

McCORMICK, Justice.

On October 18, 1978, the court suspended the law license of respondent N. B. (Mike) Wilson for an indefinite period with leave to apply for reinstatement after six months. *See Committee on Professional Ethics and Conduct v. Wilson,* 270 N.W.2d 613 (Iowa 1978). We now rule on his application for reinstatement. We find that Wilson has failed to meet his burden to submit satisfactory proof that he "is of good moral character and in all respects worthy of the right to practice law" as required by Court Rule 118.13. Therefore we deny the application.

Complainant Committee on Professional Ethics and Conduct of the Iowa State Bar Association, which serves as a commission · of this court in attorney disciplinary matters, has raised three principal issues in opposing Wilson's reinstatement. First, the Committee contends he forged the signature of Judge Wade Clarke on a dissolution of marriage decree in 1972. Second, the Committee asserts he made an insulting telephone call to Judge A. B. Crouch on October 31, 1979, and falsely denied doing so. Third, the Committee alleges Wilson violated the suspension order by filing pro se lawsuits, writing a letter as a lawyer, and listing himself as a lawyer in the yellow pages of the telephone book.

When Wilson's application was first heard on June 20, 1979, the court determined that further investigation of the Committee's allegations was warranted. The hearing was continued to permit the Department of Criminal Investigation to conduct the investigation. District Judge George Fagg was appointed a commissioner of this court to hold a subsequent evidentiary hearing and to prepare a written summary of the evidence. The parties were given leave to obtain discovery. Those proceedings were completed in due course, and the application was submitted after final hearing on February 13, 1980.

I. *Findings of fact.* We separately state our findings of fact on each contention of the Committee.

A. *The alleged forgery.* Wilson represented Mary L. Berry in a Polk County dissolution case. She sought dissolution of her marriage to William P. Berry, who was represented by attorney Edwin Skinner of Altoona. Through their attorneys, the parties attempted to reach agreement on economic issues. However, each party adamantly insisted on the right to claim their four children as dependents for income tax purposes. Mary rejected a proposed decree prepared by Skinner which provided William would have that right. She also repeatedly insisted on bringing the case to a conclusion.

On October 9, 1972, Mrs. Berry appeared with Wilson before Judge Wade Clarke in a default proceeding and offered evidence in support of her petition. Wilson had prepared an original and four carbon copies of a proposed decree which had not been approved by Skinner. The original was on bond paper and the copies were on onion skin. The decree was silent on the issue of income tax exemptions. After the proceeding before Judge Clarke, Wilson went over the form of decree with Mrs. Berry. He assured her no change would be made which would deny her the right to claim the children as dependents. He also said the decree would not be filed until after completion of necessary "paper work." Although Mrs. Berry testified in a 1978 hearing that the decree bore the signature of Judge Clarke when it was shown to her, we believe she was mistaken. Skinner had not approved the form of the decree, and Wilson delivered the unsigned original and one unsigned copy to Skinner after the October 9 hearing.

Skinner met with his client during the evening of October 10, 1972, to go over the proposed decree. Seeing that the decree was silent on the tax exemption issue, Mr. Berry refused to authorize Skinner to approve it until it was changed to award the dependency exemptions to him. Skinner therefore modified the original and copy of the decree by adding a handwritten sentence at the end of the decree, just above the signature line for the judge. The sentence read: "Respondent to have right to Claim Children on State and Federal Tax Returns as Dependents." He also changed the award for back child support from $800.00 to $600.00 on the prior page of the decree. He initialed both changes and then signed in the space provided to show his approval of the form of the decree.

Skinner obtained checks from Mr. Berry for amounts required to be paid at the time of filing the decree, including court costs. Mr. Berry was given the unsigned copy of the decree. Someone from Wilson's office later picked up the original decree and the checks.

On the morning of October 11, 1972, Wilson took the original and three remaining carbon copies of the decree to the courthouse. He dated the decrees and signed the name "Wade Clark" to each of them. A loop on the "W" in Judge Clarke's purported signature on the original of the decree covered part of the handwritten word "Dependents" in the sentence added to the decree by Skinner. Wilson changed the back child support award from $800 to $600 on each of the carbon copies but did not show the additional change regarding dependency. He filed the original and had the copies file-stamped. The clerk's stamp shows this was done at 8:23 a. m. The filed decree was microfilmed on the following day and the microfilm copy shows the handwritten changes. Wilson could not have failed to see the handwritten sentence just above the signature line before he signed and filed the decree.

However, on two subsequent occasions he gave Mrs. Berry carbon copies of the decree. Neither those copies nor the one retained in his office contained the handwritten change regarding dependency, although each included the change relating to back child support. Moreover, the four carbon copies of the decree are accounted for in the evidence. Mr. Berry kept the unsigned copy he received from Skinner on October 9. Mrs. Berry was given one copy after the filing, and she obtained another from Wilson's office later. Wilson kept the other copy in his file. Like the original, none of the copies bore the actual signature of the judge.

Mrs. Berry claimed the children as dependents for the first time in 1975 and again in 1976. Her tax returns were audited by the Internal Revenue Service in 1977, and she was charged with a tax deficiency based on her exemption claims. She then obtained a certified copy of the decree from the clerk's office and saw for the first time that the decree awarded the exemptions to Mr. Berry. When she confronted Wilson about this, he denied knowing how the language got in the decree and showed her his copy which did not include it.

Through new counsel, Mrs. Berry moved to modify the decree to give her the right to claim the children as dependents. The modification proceeding was tried before Judge Gibson C. Holliday on May 31, 1978. In that proceeding Wilson testified in behalf of Mrs. Berry. He said the decree filed October 11, 1972, was signed by Judge Clarke. He also said his copies of the decree did not show the exemptions were to go to Mr. Berry. He testified: "I note on the original decree that is signed there, that is handwritten in there, there is Mr. Skinner's signature but my initials do not appear on there. If I had it changed, I would have had Judge Clarke's signature on it. We do this on every one when there is an alteration after the judge signs the decree." When he was asked by Skinner on cross-examination if he knew who signed the decree, he responded: "I am not sure actually who signed it. I am quite sure I was at the courthouse and filed it, but there is nothing on my decree about any alleged exemptions for children."

After hearing the evidence in the modification proceeding, Judge Holliday concluded that even if Mrs. Berry had not agreed to the provision regarding exemptions, Judge Clarke must have intended Mr. Berry to have them since he signed the decree containing that provision. He denied the application for modification.

In January 1979 Mrs. Berry filed an application to set aside the decree or to modify it in which she alleged that the signature of Judge Clarke on the decree was a forgery. This application was heard by Judge Holliday on April 2, 1979. A document examiner testified he compared the signature on the decree in the clerk's office with known signatures of the late Judge Clarke[1] and concluded the signature on the decree was not that of the judge. As a result of this hearing, Judge Holliday found in his ruling of May 1, 1979, "that the signature of Judge Wade Clarke on the Decree in the Court file is a forgery and not the signature of Judge Wade Clarke." The other provisions of his ruling are not relevant in this proceeding.

On April 2, 1979, the date he heard the evidence, Judge Holliday sent a memorandum to the Polk County Attorney referring to the alleged forgery of Judge Clarke's signature. On May 29, 1979, an assistant county attorney filed an application for subpoena to obtain handwriting samples from Wilson, who he alleged "refused to present himself for the purpose of the giving of a handwriting exemplar." Subsequently a subpoena was issued to require Wilson to give handwriting exemplars, and he did so on July 2, 1979.

In the meantime, this court held its first hearing on Wilson's application for reinstatement on June 20, 1979. He made a statement in that hearing which included the following:

We finally arrived at a settlement of the decree along the lines which I stated. I went down on the morning of October 9, 1972, in front of Judge Clarke and proved up. I have a copy of the transcript here, and I just got it in the last two or three days. It has been missing, but I did find it. I recall some things now that I did not know at the time.

On that date, Mr. Skinner was not there, and I asked Judge Clarke if we could prove up and then when Mr. Skinner came in with the court cost and approval of the decree, we would file it. He said that was fine, and he signed the original decree. I met Mr. Skinner down in the Polk County Courthouse on the morning of the 11th. It was filed. The decree was filed.

Now, there are five copies of a decree. An original and four copies, rather, I have always done it that way, time and again, several thousand times. I have a copy of the decree, my client has a copy of the decree, and Mr. Skinner has two copies, one for his client, one for himself. For the life of me, I do not know what happened to the original decree.

But, a period of years went by, about three years. Mrs. Berry did not take the

1. Our records show Judge Clarke died August 22, 1977.

children as dependents in the years '72, '73, and '74. In '75 she took them as dependents and in '76 she took them as dependents, whereupon the Internal Revenue got upon her. She came out and we got to checking, and to my great surprise written in handwriting—handwritten in the decree was a notation that the respondent in the action, Mr. Skinner's client, would, as long as the support was up to date, have a chance to and could take the children as dependents.

That is in Mr. Skinner's handwriting. My signature, my initials or nothing does not appear upon it in any place. My decree does not have it in there. Mrs. Berry's decree does not have it in there. I do not know when it got in there, although Mr. Skinner admits that he wrote it in.

So, they had a hearing on that. I do not have any idea what happened to the original decree, but there were five and Judge Clarke did [sign] one of them. No doubt, my signature is there where I conformed the copies—at least my copy and her copy. I am sure that the one probably on file down there now is my copy. But that is the way it happened.

.      .      .      .      .

So help me God, I do not know what happened to the original decree. Again, so help me God, Judge Clarke did sign the original. I did sign and conform the copies of all the decrees.

The handwriting expert who compared Wilson's known signature with the signature on the filed decree concluded they were made by the same person.

Skinner, who was serving in the legislature in 1972, attended a legislative committee meeting on October 11, 1972, and was not present at the courthouse when the decree was filed.

Wilson's versions of the incident have not been consistent. In the 1978 hearing in the Berry case, he first testified the judge had signed the decree which he filed and later asserted he was not sure who actually signed it. It was only in the June 1979 hearing in this court, after the signature had been determined to be a forgery and an order had been entered requiring him to give handwriting exemplars, that Wilson admitted the signature was his. Although he denies it, the signature had to have been placed on the decree after Skinner put the two handwritten additions on it and approved its form. Wilson conformed his copies of the decree to show the change regarding back child support but omitted the change regarding exemptions, thereby concealing that change from his client. We believe this deception was intentional.

Although the forgery and original deception occurred in 1972, the incident was not before this court when Wilson's license to practice law was suspended on October 18, 1978.

B. *The telephone call to Judge Crouch.* District Judge A. B. Crouch was one of the three Polk County judges who inquired into Wilson's conduct in the January 5, 1977, altercation in the courthouse which led to his suspension. *See* 270 N.W.2d at 614.

In the hearing before Judge Fagg, the Committee introduced an affidavit in which Judge Crouch stated the following:

I, A. B. Crouch, first being duly sworn upon oath depose and state that I am a retired Judge of the Iowa District Court. I retired on November 1, 1979. On October 31, 1979, I was in my chambers at the Polk County Courthouse. The telephone rang and I answered it. The voice on the line stated "I understand this is your last day." I responded "Yes." The voice on the telephone then stated "Good riddance, you son of a bitch." He then hung up the telephone. The voice was a male voice and was one that I have heard over the past twenty years while I was actively engaged in the practice of law in Des Moines, Iowa, as well as during the period of time I was a Judge of the Iowa District Court. The voice was that of N. B. (Mike) Wilson.

Wilson introduced a responsive affidavit, as follows:

I, N. B. (Mike) Wilson, being first duly sworn, depose and state that I am the

above-named Respondent and further state as follows:

That during my 35 years of practice in the State of Iowa, I cannot recall ever having had a telephone conversation with Judge A. B. Crouch. I am reasonably certain that I would not be able to recognize his voice if I were to have a telephone conversation with him.

I have had a very limited number of cases in Judge Crouch's Court during the time he has served as a District Court Judge.

I know of no reason why Judge Crouch would think that I bear him any ill will and certainly I have never called him on the telephone and indicated any pleasure by reason of his having left the Polk County Bench. Judge Crouch is mistaken in the statement made to the effect that he believes I was the individual who called him and indicated pleasure with his having departed the Polk County Bench.

We find that the affidavit of Judge Crouch is true and that the last paragraph of the affidavit of Wilson is false.

C. *Violations of the suspension order.* The Committee showed that five small claims' actions were filed in Wilson's name subsequent to his suspension. However, the evidence established that these claims were not made by Wilson but by his wife, who served as bookkeeper for his law firm, were filed by an associate of the firm, and were brought in good faith reliance upon advice of counsel.

Committee evidence showed that Wilson wrote a letter to the United States Navy relating to a serviceman's claim bearing a date of October 18, 1978, the date of his suspension. Although he stated that the letter was dictated and mailed before he learned of the suspension, we find that the stationery which was captioned "Law Firm" was not printed until one or two weeks after his suspension. It was obtained by his former associate upon the advice of Wilson's counsel, for the firm's use during the period of Wilson's suspension.

The record also shows Wilson caused his name to be listed as an attorney in the yellow pages of the Des Moines metropolitan area telephone book. He acknowledges this was improper but asserts it was done in reliance on being reinstated before the listing was printed.

II. *Principles and conclusions of law.* We now turn our attention to the principles of law governing reinstatement and their application in the present case.

Court Rules 118.12 and 118.13 provide as follows:

118.12. In event an order of this court provides for the suspension of the license of an attorney to practice law, such suspension shall continue for the minimum time specified in such order and until this court has approved the attorney's written application for reinstatement.

Any attorney suspended shall refrain, during such suspension, from all facets of the ordinary law practice including but not limited to the examination of abstracts, consummation of real estate transactions, preparation of legal briefs, deeds, buy and sell agreements, contracts, wills and tax returns.

118.13. An application for reinstatement from any suspension shall be filed with the clerk of this court not more than sixty days prior to expiration of such suspension or time fixed for making application therefor in accordance with the provisions of court rule 117. In addition thereto the applicant shall state, in said application, that he or she has complied in all respects with the orders and judgments of this court relating to the suspension. The applicant shall also submit to this Court satisfactory proof that he or she, at time of the application, is of good moral character and in all respects worthy of the right to practice law.

These rules implement this court's inherent authority to regulate the practice of law in Iowa. *See Committee on Professional Ethics and Conduct v. Toomey*, 236 N.W.2d 39, 40 (Iowa 1975).

We must determine under the record made in each case whether the applicant for reinstatement has met the burden

to submit satisfactory proof of good moral character and worthiness in all respects to practice law. The applicant must demonstrate the same moral fitness as an applicant for original admission. *See In re Edwards*, 172 Ohio St. 351, 176 N.E.2d 409 (1961); *cf.* § 610.2, The Code ("Every applicant for such admission shall be a person of honesty, integrity, trustworthiness, truthfulness and one who appreciates and will adhere to a code of conduct for lawyers as adopted by the supreme court.").

■ The strength of proof necessary for reinstatement is affected by the nature of the misconduct which resulted in the suspension. *See State ex rel. Nebraska State Bar Association v. Butterfield*, 172 Neb. 645, 650, 111 N.W.2d 543, 547 (1961) ("The character of the respondent in a disciplinary proceeding, and the question of his reformation as to his previous unethical conduct, are of great importance in determining whether or not a reinstatement should be granted."); *In re Seijas*, 63 Wash.2d 865, 389 P.2d 652 (1964). The ultimate question is whether the applicant has demonstrated such good moral character as to justify being recommended to the public as a trustworthy person fit to be consulted in matters of confidence. *See In re Herman*, 293 Minn. 472, 473, 197 N.W.2d 241, 242 (1972); *In re Egan*, 52 S.D. 394, 218 N.W. 1 (1928); *In re Cannon*, 206 Wis. 374, 240 N.W. 441 (1932). In answering this question, the court cannot ignore misconduct antedating the suspension which is probative of present fitness, even though not before the court at the time of suspension. *See In re Riccardi*, 80 Cal.App. 66, 74, 251 P.2d 650, 653 (1926).

■ It is misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. DR 1-102(A)(4). Plainly, the forging of a judge's signature to a decree is a violation of this rule. So are misrepresentations to the courts. *See Wilson*, 270 N.W.2d at 616. Deception of a client is also proscribed. *See Committee on Professional Ethics and Conduct v. Baker*, 269 N.W.2d 463, 466 (Iowa 1978).

■ Noncompliance with a suspension order is an additional basis for discipline. *See Committee on Professional Ethics and Conduct v. Gartin*, 272 N.W.2d 485, 487 (Iowa 1978). It follows that violations of a suspension order may bar reinstatement. *See Butterfield*, 172 Neb. at 647–50, 111 N.W.2d at 545–47.

■ In the present case, the most serious objection to Wilson's reinstatement is his forging of Judge Clarke's signature to the Berry dissolution decree and the deception of his client and the courts regarding the forgery and the terms of the decree. His prior suspension was based in part upon the fact he told a panel of judges a version of the courthouse altercation which "contained many misrepresentations or misstatements of material facts." *See* 270 N.W.2d at 616. The evidence of his conduct relating to the Berry dissolution case also shows he is not an honest person. We cannot say he has offered satisfactory proof that he "is of good moral character and in all respects worthy of the right to practice law."

Other evidence supports this conclusion. After making an insulting telephone call to Judge Crouch, he gave a false affidavit about it. He back-dated a letter written after his suspension in which he represented himself as a lawyer, and he made false statements about that event. And he listed himself as an attorney in the telephone book even though he had no assurance he would be reinstated when the listing was published.

In support of his application, Wilson presented many impressive letters from lawyers and judges attesting to his character. These testimonials are of questionable value. *See In re Harris*, 88 N.J.L. 18, 24, 95 A. 761, 763 (1915) ("Personally solicited letters or mere signatures obtained to a petition, while plenary evidence of the unwillingness of such signers to deny a personal favor, is very far from being cogent evidence of any particular state of facts, especially if it relates to the moral character of the person who obtains the letters or circulates the petition."). Moreover, the record

does not show that the writers were aware of the incidents of dishonesty and deceit which permeate the present record. If the writers were aware, their endorsement of the application for reinstatement would be unwarranted.

We hold that Wilson did not carry his burden under Court Rule 118.13.

APPLICATION DENIED.