**In the Matter of James Ray PETERSON, who seeks permission to take the Iowa Bar Examination.**

**Petition of James Ray PETERSON.**

**No. 89–80.**

Supreme Court of Iowa.

April 19, 1989.

As Amended on Denial of Rehearing May 11, 1989.

Rehearing Denied May 11, 1989.

Roxanne Barton Conlin of Galligan & Conlin, P.C., Des Moines, for petitioner.

Thomas J. Miller, Atty. Gen., Julie F. Pottorff, Asst. Atty. Gen., for the Iowa Bd. of Law Examiners.

Considered by McGIVERIN, C.J., and LARSON, SCHULTZ, SNELL and ANDREASEN, JJ.

ANDREASEN, Justice.

James Ray Peterson has been denied the opportunity to take the Iowa bar examination five times in the past eight years. We again review the record to determine if he has demonstrated full and complete rehabilitation and to inquire into his present good moral character. We find he has not satisfied the moral fitness requirement and should not be permitted to take the bar examination.

I. On March 2, 1988, Peterson filed his sixth application for the Iowa bar examination. His application included a detailed list of disciplinary action that had been taken against him. It included his authorization to the Iowa Board of Law Examiners (board) to acquire from any source information that the board might request concerning his character qualifications. We ordered an evidentiary hearing be held before a hearing officer and that the board then consider such additional evidence as may be presented. The record included the file maintained on the applicant, five exhibits, and the transcript of oral testimony of witnesses and the argument of counsel at the hearing. As directed, the hearing officer prepared a written summary of the evidence. The board reviewed the application and additional information supplied by the applicant and concluded the applicant had failed to demonstrate the requisite moral character. Peterson then filed with us a petition for review.

II. We have the inherent power to regulate the admission to the practice of law. *Committee on Professional Ethics & Conduct v. Bromwell,* 221 N.W.2d 777, 780 (Iowa 1974). The power to admit persons to the practice as attorneys in the courts of this state is vested exclusively in the su-

preme court. Iowa Code § 602.10101 (1987). The applicant for admission to the bar must be a person of honesty, integrity, trustworthiness, truthfulness, and one who appreciates and will adhere to a code of conduct. Iowa Code § 602.10102; Iowa Ct. R. 103.

We appoint members to the Iowa Board of Law Examiners. Iowa Code § 602.10103; Iowa Ct.R. 100. The board regulates admission to the bar under the rules promulgated by us and makes an investigation of the moral fitness of any applicant. The board may procure the services of any bar association, agency, organization, or individual qualified to make a moral or character report. Iowa Ct.R. 104.

■ The right to practice law is not a natural or constitutional right, but is in the nature of a privilege or franchise. *In re Disbarment of Meldrum,* 243 Iowa 777, 784, 51 N.W.2d 881, 884 (1952). However, the right to practice law is not a matter of grace. We cannot exclude a person from the practice of law for reasons that contravene the due process or equal protection clauses of the United States Constitution. *Schware v. Board of Bar Examiners,* 353 U.S. 232, 238–39, 77 S.Ct. 752, 756, 1 L.Ed. 2d 796, 801 (1957); *see also* Annotation, *Good Moral Character of Applicant as Requisite for Admission to Bar,* 64 A.L.R. 2d 301 (1959).

■ III. Our review of the record is de novo. The applicant has the burden of submitting satisfactory proof of good moral fitness. Iowa Ct.R. 103; *see also Committee on Professional Ethics & Conduct v. Wilson,* 290 N.W.2d 17, 23 (Iowa 1980). The degree of proof required is that of a convincing preponderance of the evidence. *See Committee on Professional Ethics & Conduct v. Kraschel,* 260 Iowa 187, 148 N.W.2d 621, 625 (1967).

IV. The basic facts as established in the record are as follows. James Ray Peterson was born March 15, 1945. Before graduating from Des Moines East High School he had been committed to the Iowa Training School at Eldora on three separate occasions. In 1960 he was committed to the

Iowa Training School at Eldora where he remained for forty-seven weeks. Peterson enlisted into the United States Army in August of 1962. In February of 1963, following his court-martial, he was given a general discharge. Upon leaving the military service he returned to Des Moines. In 1963 he was incarcerated six weeks for writing bad checks and served four months for resisting arrest. He served ten days and paid a fine for possession of beer while a minor in 1965. In 1968 he was charged with breaking and entering and with carrying a concealed weapon in Palo Alto County. While out on bond, he was arrested for possession of burglary tools in Polk County. After being found guilty to both felony charges of breaking and entering and possession of burglary tools, he was sentenced to concurrently serve ten and fifteen years, and was committed to the Men's Reformatory. Peterson was released from the reformatory and placed on parole in 1971. He pled guilty to the misdemeanor crime of assault and battery arising from an altercation with his girlfriend, Ms. Fong, in December of 1976. He has had no criminal arrests or convictions since that date. His 1984 application for a pardon was denied.

After Peterson's parole in 1971 he secured employment with the Iowa Employment Security Commission. He enrolled at Drake University and received a bachelor of arts degree in sociology in 1975. He was employed with the Iowa Department of Social Services while attending the university and later with the Polk County Department of Social Services. During the period between 1975 and 1979 he completed twenty semester hours of graduate course work in public administration. In 1979 he entered Drake University Law School. While attending law school he served as a law clerk for the Iowa district court and also served as a law clerk in a Des Moines law office. He made the dean's list and graduated with a juris doctorate degree in 1982. After graduation from law school he secured employment with the Iowa Civil Rights Commission. After serving two years in that capacity he was employed by the Iowa Department of Corrections. In 1987 he accepted employment with the Citizens Aide/Ombudsman office.

When Peterson entered the Drake University College of Law, he filed a law student registration. His application included a list of twenty-one separate disciplinary actions taken against him between 1958 and 1976. His application gave the following explanation for the 1976 assault.

> I pled guilty to an assault and battery charge arising out of a domestic dispute. I lived with a woman with whom I was attending school, and I found out that she was seeing someone else. I confronted her one morning after she left her new friend's place, asking to talk to her. She agreed after my strong insistence, and she let me enter her car. We got into an argument after she hit me several times. I threw up my arms to ward off a blow and forced her arm into her glasses. I was technically guilty, so I pled to resolve the charge. We discussed our relationship several times after that, and I have not seen her since.

On April 30, 1980, Peterson was notified by the board that he failed to demonstrate the moral character necessary to be admitted into the Iowa bar. He appealed this recommendation and on June 13, 1980, Peterson appeared before a three-justice panel of this court. At this hearing, Peterson made the following statement concerning the 1976 assault:

> The domestic dispute that was mentioned in 1966 [1976] was just that; it was a domestic dispute. I did not strike the lady. I warded off one of her blows, and in doing so our arms did come into contact. Her glasses did fall off. She received no bruises, no marks, and no injuries.

The court advised Peterson and his attorney that the record would remain open, and that if they wanted to offer additional information the court was willing the hear it, even at a subsequent time if they would let the court know. Following the June 13 hearing, the court requested the Iowa Division of Criminal Investigation (DCI) to investigate the 1976 assault.

On August 22, 1980, this court denied Peterson permission to take the Iowa bar examination. The applicant's long-term disregard for the law, including two felony convictions and a 1976 conviction for assault and battery, weighed heavily in the court's ruling. The court stated:

This court in its de novo review heard and witnessed applicant's oral statement relating to some of these incidents. With this opportunity to see and hear the applicant, the court concluded that in all instances applicant was not testifying truthfully, particularly concerning the 1976 assault and battery charge.

Regarding the DCI report, the court stated

Following the June 13 hearing, the court requested the Iowa Division of Criminal Investigation to investigate some of the claims made by the applicant. That investigation resulted in a written report which the court is placing in its clerk's office with instructions to the clerk to make it available for inspection only by the applicant and his attorney. The court has given this report no consideration or credence in this review, except to note that it furnishes no corroboration for the applicant's version of the assault and battery incident which would influence the court to modify its determination that applicant was not testifying truthfully in his June 13, 1980, statement under oath to the court.

Thus, although the court did not consider the report in its 1980 decision, the DCI report did become a part of the record for consideration when reviewing subsequent applications.

In 1987, Peterson's attorney contacted Ms. Fong, and asked that she provide a statement of the facts relating to the 1976 assault. On April 7, 1987, Peterson personally contacted Ms. Fong and requested information about the assault. He found her very hostile. She refused to discuss the incident but suggested Peterson's attorney would be hearing from her. Instead of writing to Peterson's attorney, she forwarded a letter and affidavit to the Iowa Supreme Court. This letter was file-stamped on April 22, 1987, and was placed in Peterson's file.

On April 27, 1988, Peterson filed a motion for permission to take the June 1988 Iowa bar examination. On May 11, 1988, the application was returned by this court to the board with directions to conduct an evidentiary hearing. On July 11, a hearing officer was appointed to conduct the hearing and the hearing officer was directed to take judicial notice of the information considered by the board and directed to consider such additional evidence and arguments as may be presented at the hearing.

At the evidentiary hearing September 14, 1988, Peterson again testified that the 1976 assault was a minor altercation which was only technically an assault. When questioned by the hearing officer, further information revealed that Peterson waited for Ms. Fong to enter her car and then pursued her in his automobile. In a rural area, Peterson continued to follow Ms. Fong, finally pulling his car alongside of hers causing her to pull off the road and park. He gained access to Ms. Fong's car only after he pounded on the window frame of her car.

Peterson began driving the vehicle against Ms. Fong's desire. While driving the vehicle he made threats suggesting life wasn't worth living. Blows were exchanged between Peterson and Ms. Fong, and her glasses were knocked off. Ms. Fong managed to reach the ignition key, shut the engine off, and in the process, broke the key off in the ignition. She exited the car while it was slowing down and before it came to a halt. Peterson testified that he then left the car and pursued her. He testified that he grabbed her and started to pull her back to the car. He further testified

When she jerked away and the sleeve ripped, I did not let go. I still had a hold and—of the muffler, and she fell on the ground. And as I turned around I saw the car rolling in the ditch and she's laying on the ground. She obviously doesn't want to come to me. I don't want to be out in the middle of nowhere

without a car. I dropped her and I started running back to the car.

When I say "dropped her," she is sagging against me with her weight. It was then I noticed she didn't have her glasses. I went to the car. I didn't make it before it went in the ditch. I got in, noticed she'd broke the key off. The keys were on the floor of the car. I went back to my car.

Ms. Fong's affidavit states she was knocked to the ground and received severe bruises around her neck from being dragged by her scarf.

When asked if he didn't have any concern about leaving her in a car that was disabled and without glasses in the middle of the road in the middle of the winter, Peterson answered, "She was running towards a farmhouse and had almost gotten to a farmhouse before I got back to the car." When then asked if Ms. Fong was extremely scared, Peterson responded "There's no doubt that she was upset. I was very emotional also and the farmhouse was occupied. It was in the wintertime, as I said. There was smoke coming from the chimney. I remember there was some kind of activity, and I assumed she would take care of herself."

■ VI. In our review of the record to determine Peterson's moral character, we have considered the factors enumerated in *In re Manville*, 538 A.2d 1128, 1133 n. 4 (D.C.App.1988). These factors include

1. The nature and character of the offenses committed.

2. The number and duration of offenses.

3. The age and maturity of the applicant when the offenses were committed.

4. The social and historical context in which the offenses were committed.

5. The sufficiency of the punishment undergone and restitution made in connection with the offenses.

6. The grant or denial of a pardon for offenses committed.

7. The number of years that have elapsed since the last offense was committed, and the presence or absence of misconduct during that period.

8. The applicant's current attitude about the prior offenses.

9. The applicant's candor, sincerity and full disclosure in the filings and proceedings on character and fitness.

10. The applicant's constructive activities and accomplishments subsequent to the criminal convictions.

11. The opinions of character witnesses about the applicant's moral fitness.

Peterson has demonstrated that he has won the support, affection and respect of friends, members of the bar, and employment associates who have written and testified on his behalf. His conduct since release from prison is strong evidence of his desire to be a law-abiding and contributing member of society.

However, in our determination as to his present moral character, we must recognize the seriousness of his long history of law violations and felony convictions, his assault and battery of Ms. Fong, and his failure to testify truthfully before this court. Without looking beyond Peterson's 1988 testimony, it becomes apparent that his initial descriptions of the 1976 incident as a technical and minor assault were attempts to mischaracterize the incident. This testimony displays a callous and indifferent attitude toward an explosive personal confrontation. When the DCI report and Ms. Fong's letter and affidavit are properly considered, Peterson's attempts to mislead become even more apparent.

As stated in our order filed August 22, 1980, this court has a responsibility that extends beyond the concepts of what might be best for the applicant's rehabilitation. The court has a responsibility to the citizens of Iowa. We conclude Peterson does not satisfy the requirement of good moral character required of those allowed to take the bar examination.

■ VII. Peterson claims he was denied procedural due process. At some stage prior to the final denial of admission to the bar based upon a lack of good character, the applicant must be adequately informed of the nature of the adverse character

information and must be given an opportunity to answer and refute accusations. This would include, at the applicant's request, the opportunity to confront and cross-examine a person who provided adverse information. *Willner v. Committee on Character & Fitness*, 373 U.S. 96, 104, 83 S.Ct. 1175, 1180, 10 L.Ed.2d 224, 230 (1963).

While an applicant is entitled to a hearing, that hearing does not encompass all procedural aspects of a full-dress adversary proceeding. *See In re Childs*, 101 Wis.2d 159, 165, 303 N.W.2d 663, 667 (1981). In this type of application process, it is reasonable and necessary for the board to consider character recommendations and background information. Some of the recommendations and background information will necessarily consist of hearsay, which would not be admissible in a traditional trial between adversaries. Although hearsay evidence may be a part of the record, the applicant has the right to contest the reliability or accuracy of the adverse information.

Peterson claims that his procedural due process rights were violated because information considered by the board include the letter and affidavit of Ms. Fong and the DCI report. He also argues that his due process rights were violated because the board's recommendation to deny his application did not specifically state the reasons for denial.

Procedural due process requirements have been satisfied. Peterson received adequate notice of the nature of the adverse information. For at least eight years, Peterson has been fully aware that his explanation and the circumstance surrounding the 1976 assault were a significant factor in the denial of his applications. Since 1980, Peterson has had access to the DCI report. In 1981, an attorney appeared for Peterson for the purpose of reviewing the Iowa Division of Criminal Investigation Report on file in this matter, and advising Mr. Peterson of alternative solutions available to him. Peterson testified in the 1988 hearing that he had reviewed the report and taken extensive notes from it.

In 1987, both Peterson and his attorney contacted Ms. Fong about the 1976 assault. This contact precipitated Ms. Fong's letter and affidavit addressed to this court.

Peterson was aware the hearing officer had taken judicial notice of the information considered by the board prior to the September 1988 hearing. He had an opportunity to answer and refute accusations at the hearing. He had an opportunity to examine all letters, documents, and reports contained in his file. He was not denied his right to present additional evidence, including the sworn testimony of witnesses, at the hearing.

We find there has been no denial of Peterson's procedural due process rights.

PETITION FOR PERMISSION TO TAKE BAR EXAMINATION DENIED.