In the Matter of the Application to the Bar of North Dakota of R. Frank **LAYON, Petitioner,**

v.

**NORTH DAKOTA STATE BAR BOARD, Respondent.**

Civ. No. 890393.

Supreme Court of North Dakota.

July 6, 1990.

A.D. Richau (argued), Bismarck, for petitioner.

Richard H. McGee II (argued), Minot, for respondent.

ERICKSTAD, Chief Justice.

Robert Franklin Layon seeks review of the North Dakota State Board of Bar Examiner's (Board) negative recommendation for admission to the Bar of North Dakota on the grounds that he lacks the good moral character required for such admission. We accept the recommendation of the Board and deny Layon's application for admission.

Layon is a 1988 graduate of the California Western School of Law in San Diego. Upon his application for admission to the Bar of North Dakota, an investigation was conducted by the Board. Based upon that investigation, an informal hearing was held on June 15, 1989, attended by Layon and members of the Board. Following that hearing, the Board concluded that although Layon had met academic qualifications and had passed the February 1989 Bar Examination, a negative recommendation was warranted because Layon did not prove that he possessed good moral character. By notice dated June 21, 1989, Layon was advised:

"The Board's recommendation is based on the information before the Board which shows that your conduct includes inappropriate behavior in the following respects:

1. Unlawful conduct;

2. It appears you may have made false statements and did not fully disclose information requested in the admission application;

3. Fraud and misrepresentation;

4. Neglect of financial responsibilities;

5. Compulsive gambling (emotional instability)."

On June 27, 1989, Layon requested a formal hearing as provided under Rule 6(B)(2) of the North Dakota Supreme Court Admission to Practice Rules (N.D.R.Adm.

to Prac.). A formal hearing was conducted on September 20 and 21, 1989. On November 3, 1989, the Board, by written opinion, affirmed its earlier recommendation that Layon not be admitted to the Bar of North Dakota. Layon timely filed a Petition for Review with this Court, seeking review of the above-described decision of the Board pursuant to Rule 6(C), N.D.R.Adm. to Prac., and raised the following issues:

"1. WAS THE APPLICANT DENIED DUE PROCESS OF LAW AS A RESULT OF THE ACTIONS OF THE BOARD AND THE PROCEDURE WHICH WAS FOLLOWED IN THIS MATTER?

"2. DID THE BOARD ERR IN DENYING THE APPLICANT'S MOTION FOR IMMEDIATE ADMISSION TO THE NORTH DAKOTA BAR?

"3. DID THE APPLICANT MEET THE REQUIRED STANDARD OF PROVING HIS PROPER MORAL CHARACTER BY A PREPONDERANCE OF THE EVIDENCE DURING THE HEARING IN THIS MATTER?"

The power to admit persons to practice as attorneys and counselors at law in the courts in this state is vested in the Supreme Court. Section 27–11–02, N.D.C.C. For this reason, we apply the standard of *de novo* review on the record while still giving some credence to the findings of the Board. The requirements for admission as promulgated by this Court are as follows:

"(A) No person may be admitted to practice as an attorney and counselor at law in this state unless the person:
(1) is at least eighteen (18) years of age;
(2) is of good moral character;
(3) has designated the Clerk of the Supreme Court as the applicant's agent for service of process for all purposes;
(4) has received a juris doctor or equivalent degree from a law school approved or provisionally approved for accreditation by the American Bar Association;
(5) has complied with either Rule 3 or Rule 4; and
(6) has paid all required fees."

Rule 1, N.D.R.Adm. to Prac. As the California Supreme Court points out, the requirement that applicants to practice law be of good moral character is a prerequisite to practice law in every state of our country. *Pacheco v. State Bar of California,* 43 Cal.3d 1041, 239 Cal.Rptr. 897, 741 P.2d 1138, 1139 (1987). That court has defined the term "good moral character" as follows:

"The term 'good moral character' has traditionally been defined in California as ' "an absence of proven conduct or acts which have been historically considered as manifestations of 'moral turpitude.' " ' Good moral character has also been defined to include 'qualities of honesty, fairness, candor, trustworthiness, observance of fiduciary responsibility, [observance] of the laws of the state and the nation and respect for the rights of others and for the judicial process.' " [Cite omitted.]

*Pacheco,* 239 Cal.Rptr. at 898, 741 P.2d at 1139.

Under the review procedures, the applicant has the burden of proof by a preponderance of the evidence. Rule 6(C)(4), N.D.R.Adm. to Prac. Among other things, an applicant is required to submit an application for admission to the Bar of North Dakota. The application is used to assess an applicant's qualifications in all respects for admission to the Bar. It requires full, true and complete disclosure in all respects to the questions asked. All applicants are warned of the importance of full disclosure:

"I fully understand the following answers and statements are submitted under oath and that failure to answer any question or to make full disclosure of any fact or information may result in denial of my application for admission or subsequent disciplinary proceedings."

The Board found Layon's responses to question 16 of the application to be crucial in its investigation. Question 16(a) reads:

"Have you ever been charged with crime or arrested?"

To that, Layon responded "yes." Question 16(b) reads:

"Have you ever been charged with violation of any motor vehicle law (excluding parking offenses)?"

To that, Layon responded "no." The application also asks for a full explanation of any "yes" responses to question 16. Pursuant to Layon's response to question 16(a), he added:

"I was a member of the Williston Jaycees and was put in charge of our charitable gambling operations. During that time, there was a shortage of approximately $17,000.00 from that operation. I was charged with Theft of Property. The State of North Dakota vs. Robert Franklin Layon, Williams County, later moved to Ward County, District Court, Irv Nodland was my attorney. I was acquitted at my trial."

There was no further response to question 16(b) as Layon had answered "no" to that question.

Upon investigation, the Board uncovered eight additional charges which Layon failed to disclose in response to question 16(a):

"1. 07–17–69—Illegal possession and open container.

"2. 11–17–76—Aggravated promotion of prostitution and gambling (Texas courts).

"3. 03–31–82—Forgery.

"4. 06–22–82—NSF check ($9,172.00).

"5. 08–23–82—NSF check ($6,800.00).

"6. 09–20–82—Forgery (2 counts).

"7. 06–07–83—Theft of property (2 counts).

"8. 01–18–88—No account check."

The 1976 Texas gambling charge was dismissed. Layon did plead guilty, however, to aggravated promotion of prostitution, a Class C Felony. Layon claimed the prostitution charge arose out of his actions as a "paid informant" and that he pled guilty to the felony for his own safety and for the "continuing operation."[1] When asked why the prostitution charge was not disclosed on the Bar application, Layon said he thought the conviction had been "expunged," and need not be disclosed. Layon testified that the NSF check charges were not disclosed because he "forgot about them." Layon also explained the situations concerning the forgeries and theft of property counts. The Board found Layon's failure to disclose the charges and Layon's own explanations to be "unconvincing, evasive and lacking in candor and truthfulness."

Pursuant to its investigation, the Board uncovered at least 25 separate violations of motor vehicle laws, which Layon failed to disclose in response to question 16(b), including a present outstanding warrant for Layon's arrest in San Diego, California. Layon's explanation was that he simply read the question "too quickly." He claimed it was an "oversight" and a "pure mistake." The Board found his testimony and explanation of non-disclosure neither candid nor credible.

The Board's investigation also uncovered undisclosed civil judgments, one of which imposed punitive damages for Layon's conduct. At the time of the hearing, excluding obligations to members of his family, the Board concluded that "he appears to owe others in excess of $125,000."

The Board also found a past history of conversion and the misappropriation of monies in his possession which were held under a trust relationship. Of particular concern was a matter concerning some stock options in 1986. This conduct commenced in March of 1986 while Layon was arranging to attend law school. Layon dealt with stock broker, Candace Ainslie of National Securities Corporation, Spokane, Washington, in attempting to make a purchase of "penny stock options." These options are quite speculative and, as Layon admitted, are really just another form of gambling. Layon was informed that no options could be purchased until he completed and returned account forms, including an affidavit of financial worth. Layon represented that he had, on March 12, 1986, an approximate annual income of $70,000 to $100,000. He also represented his approximate net worth as being from $1,500,000 to $2,200,-000. At the formal hearing, Layon re-

1. The only Texas official who could have confirmed Layon's story has since died.

sponded to questions concerning the incident as follows:

"Q. Now drawing your attention to Exhibit No. 10, which is the option information which Candace Ainslie testified about, you represented to her that you had a net worth of approximately 1.5 million to 2.2 million, did you not?

"A. Yes, I did.

"Q. And that was not truthful, was it?

"A. In retrospect, no, it was not.

\*　　\*　　\*　　\*　　\*　　\*

"Q. ... You've also listed an approximate annual income of 70,000 to $100,-000. That also was not truthful or honest; is that correct?

"A. That is correct.

"Q. What, in fact, was your approximate annual income at the time that you represented to National Securities as 70 to $100,000 annual income?

"A. Mr. McGee, I don't remember exactly what it was at that time. It would have been what I relayed to the Court in my divorce proceedings. It would not have changed.

"Q. So 12 to $1400?

"A. Yes, sir.

"Q. Per month?

"A. Yes, sir.

\*　　\*　　\*　　\*　　\*　　\*

"Q. Sir, I'm referring you to the last page in Exhibit 10, which is a letter written by you to Candace Ainslie dated May 4 of 1988, and I would request that you read for the Board the first paragraph on page two of that letter?

"A. 'As to your belief that I lied on my application to you dated 3–12–86, this is also not true. At that time I was part owner of two corporations that had substantial holdings in the oil and gas industry in the Williston Basin. We also had properties in Oklahoma, Texas and Kentucky. My approximation of my net worth and annual salary reflected those holdings. Unfortunately due to the fall in oil prices, those holdings became literally worthless and had to be disposed of to take care of past liabilities. In fact, I

still have some obligations from those transactions.'

"Q. So while you were in law school and in fact last year, you again lied to Ms. Ainslie about your financial situation at the time you took out the options?

"A. Mr. McGee, if I may explain?

"Q. Sure.

"A. I don't think that was a lie to Ms. Ainslie. What I was trying to relate to her is that at the time I filled out the application I was relying on information from Mr. Healy that he would put me in oil and gas ventures in Kentucky, Texas and Oklahoma and in a gold and silver mine operation in the State of Arizona. Those things did not materialize.

"Q. Well, your letter of 1988 states—well, first, let's back up. You agree that the information that you told Ms. Ainslie in '86 at the time you took out the options was false; correct?

"A. In looking back on it, yes, sir.

"Q. And doesn't your letter of '88 indicate that in '88 you're saying it was not false?

"A. In '88 when I wrote that letter, Mr. McGee, I'm stating that at that time I had still hoped that Mr. Healy would come through with the promises that he had made.

"Q. But the '88 letter states my approximation of my net worth and annual salary reflected those holdings. Your approximation of your net worth and annual salary in '86 was totally blown out of proportion, was it not?

"A. It reflected my anticipated holding.

"Q. Well, does your letter of 1988 to Ms. Ainslie make any reference as to your anticipating what your income might be?

"A. No, sir, it does not.

"Q. In fact, at all times you represented to her that your net assets, in fact, were as represented in the option form; correct?

"A. No, sir. I have told Ms. Ainslie subsequent to that letter my true financial position when I've been paying her back."

Layon had attempted to cover his stock options with two different $5,000 sight drafts sent to Ainslie. Neither of the drafts were honored and Ainslie was personally held responsible for a loss of $4,183.00. In explaining her attempts to collect on this debt from Layon, Ainslie responded to questions as follows:

"Q. Can you briefly tell us what efforts you've made and to what extent you've had some success?

"A. Well, I started out—I tracked him down through conversations. I called several people at the time in Williston, trying to find out where he had gone, and I found he was in law school in California. So I hired a firm in San Diego to track him down for me and had him served with a letter from an attorney asking for payment. He called my lawyer and said that he thought it had been taken care of and that he would take care of it. Again, quite a bit of time went by and nothing transpired, so I wrote a letter to the school, to the dean, expressing my feelings towards Frank and that he owed me this money. It was turned over to a Janet Mottley.

"Q. At the school?

"A. At the school. He started making payments after we got a promissory note from him. He admitted he owed the money. He always apologized when his payments were late or he didn't make a payment, but I felt the only time he made a payment was when I pursued the matter vigorously.

"Q. Did he tell you why he couldn't have paid for the options at the time they were purchased in March of '86?

"A. No, he didn't.

"Q. Did it seem odd to you that a person with assets in excess of one to two million couldn't pay that?

"A. Yes.

"Q. Did you approach him on that?

"A. Well, I—I asked him why he couldn't pay me the full amount. He said he had lost all the money in some oil investments and he had no money.

"Q. Did he ever tell you when he lost the money?

"A. After the stock—the options. I don't have a specific date on it, but when asked if he would show me any documentation of how he had lost it, he refused.

"Q. And the Exhibit No. 10 also contains a letter to you from Mr. Layon; correct?

"A. Mm-hmm.

"Q. And did that again state to you in May of 1988 that his application was true and that he had substantial holdings at that time when he made the application?

"A. That's correct."

Layon had apparently contacted Ainslie prior to her coming to North Dakota to testify. Ainslie responded to questions concerning that contact as follows:

"Q. Did he [Layon] contact you prior to this hearing to inquire as to your testimony?

"A. Yes, he did.

"Q. When did he contact you?

"A. That was on Monday.

"Q. What did he ask you?

"A. He asked if I was going to come and testify and I told him I was. He wanted to know why, and I told him that I felt that it was time for him to kind of basically own up to what he has been doing, and he said well, if he didn't become a lawyer, he wouldn't be able to pay me back.

"Q. How did you interpret his response—that response, the meaning?

"A. The meaning, that if I was to come that I wouldn't be receiving any more money even though I have a legal promissory note."

This stock option incident which occurred in 1986 and was apparently perpetuated in 1988 could reasonably be seen as bearing directly on Layon's ability to handle money and on the issue of his good moral character.

Application question 20 in part asks: "Have you ever been treated or confined for mental or emotional disorders ...? Layon answered "no." Pursuant to its investigation, the Board discovered that Layon had a pervasive problem with gambling. At the formal hearing, several witnesses

called, on behalf of Layon, testified as to their understanding that he had obtained professional treatment for a gambling addiction and that his addiction was in remission. While Layon also testified that he has his gambling problem under control, he admitted that he had undergone very little formal treatment for the problem. We believe it was proper for the Board and that it is proper for us to consider this type of compulsion in determining whether or not an applicant could reasonably be expected to be trustworthy and dependable, especially in conjunction with responsibility for client's funds. Had Layon been anxious to show his complete rehabilitation and *present* good character and a severance from his past indiscretions, he could and should have been completely candid throughout his application and particularly in relation to this issue. This he was not.

Layon contends that he was denied due process of law guaranteed by the Fourteenth Amendment of the United States Constitution as a result of the actions of the Board and the procedures which were followed in this matter and that the Board erred in denying his motion for immediate admission to the North Dakota Bar. Layon asserts that the lack of rules, guidelines, and statutes involved in this type of proceeding renders an applicant helpless in the preparation of his case.

At the outset of the formal hearing, counsel for Layon made a motion to the Board to dismiss the hearing and to make a recommendation to the Court for immediate admission of the applicant to the North Dakota Bar. This motion was based upon the contention that the Board failed to give proper notice to Layon of the specific grounds upon which its negative recommendation was made. Such notice is required under Rule 6(B)(1), N.D.R.Adm. to

Prac.[2] The notice given Layon, as previously set forth at the onset of this opinion follows:

"[I]nappropriate behavior in the following respects:

1. Unlawful conduct;
2. It appears you may have made false statements and did not fully disclose information requested in the admission application;
3. Fraud and misrepresentation;
4. Neglect of financial responsibilities;
5. Compulsive gambling (emotional instability)."

Layon contends that these allegations are much too vague to enable him to prepare an adequate defense. He claims that the problem is compounded due to the fact that no discovery is provided for under the Board's rules. Layon cites the Wisconsin case of *Matter of Childs*, 101 Wis.2d 159, 303 N.W.2d 663, 668 (1981), and relies upon the following quotation to stress the importance of a factual basis:

"[W]hen the derogatory matter appears from information supplied or confirmed by the applicant himself, or is of an undisputed documentary character disclosed to the applicant, and it is plain and uncontradicted that the committee's recommendation against admission is predicated thereon and reasonably supported thereby, then neither the committee's informal procedures, its ultimate recommendations, nor a court ruling sustaining the committee's conclusion may be properly challenged on due process grounds, *provided the applicant has been informed of the factual basis of the conclusion and has been afforded an adequate opportunity to reply or explain.*"

Because of a denial of due process, the court in *Childs* remanded the decision of

---

**2.** Rule 6(B)(1), N.D.R.Adm. to Prac., reads as follows:

"If the State Bar Board makes a negative recommendation for admission to the bar or a negative decision on licensure for any reason, it shall so notify the applicant by certified mail directed to the applicant at the mailing address appearing on the applicant's application. The notice must specify the grounds for the negative recommendation or decision by the State Bar Board. If the negative recommendation or decision is based on the grounds that the applicant has failed to pass a portion of the bar examination or the attorney's examination, the applicant must be furnished with a copy of the essay portion of the applicant's examination and a copy of a set of model essay examination answers."

the Wisconsin Board which denied Childs' admission to the Bar based upon his lack of moral character. Layon likens the *Childs* case to the case at hand contending that there is no adequate "factual basis" for the Board's denial of Layon's admission. However, in *Childs,* the applicant was not given any reasons for the determination that he lacked the requisite moral character to warrant certification. Also, Childs was not afforded a formal hearing. For these reasons, the Wisconsin Supreme Court remanded the case to the Board for further proceedings.

In the instant case, Layon was given five grounds for the finding of a lack of good moral character. While not models of specificity, they are sufficient to put an applicant on notice as to the factual basis for the allegations and if he believed them to be insufficient to aid him in his preparation for the hearing, he should have requested that they be made more definite and certain. The grounds cannot be viewed in a vacuum. Layon, himself, had knowledge of his prior action and the Board maintained an "open files" policy which enabled Layon to have access to the complete file upon which the Board would rely. Pursuant to request, Layon was given access to that file. Also, Layon, his counsel, and counsel for the Board, met and discussed the exhibits upon which the Board intended to rely at the formal hearing. Both Layon and his attorney were adequately informed of the nature of the evidence to be presented, no objection was made to the indefiniteness at that time, and a full hearing was conducted thereafter. Under these circumstances, we find the allegation of denial of due process to be without merit. Certainly there was not only notice and hearing, but more than adequate notice and hearing and that is what is usually required to satisfy due process requirements.

The fundamental requirement of due process is an opportunity to be heard upon such notice and proceedings as are adequate to safeguard the right for which the constitutional protection is invoked. *Link v. Wabash R.R. Company,* 370 U.S. 626, 632, 82 S.Ct. 1386, 1389, 8 L.Ed.2d 734, 739 (1962) (no due process violation where

complaint was dismissed *sua sponte* for failure to prosecute without affording notice of its intention to do so, or providing an adversary hearing before acting). The adequacy of notice and hearing respecting proceedings that may affect a party's rights turns, to a considerable extent, on the knowledge which the circumstances show such party may be taken to have of the consequences of his own conduct. *Link,* 370 U.S. at 632, 82 S.Ct. at 1389–90, 8 L.Ed.2d at 739. In the instant case, Layon was aware of his past indiscretions.

In relation to a state bar applicant, the United States Supreme Court has held that due process requires that a petitioner receive notice of and a hearing on the grounds for his rejection. *See Willner v. Committee on Character and Fitness,* 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963) (violation of procedural due process where applicant was denied admission to New York Bar without a hearing on the charges filed against him).

This Court has previously adopted such a view. We have held:

> "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.' *Cleveland Board of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985), citing *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950)."

*Froysland v. N.D. Workers Comp. Bureau,* 432 N.W.2d 883, 892–93 (N.D.1988). *See also, Powell v. Hjelle,* 408 N.W.2d 737 (N.D.1987) (no due process violation where procedural due process requirements of right to notice and a meaningful opportunity for a hearing appropriate to the nature of the case have been met); *Matter of Disciplinary Action Against Garcia,* 366 N.W.2d 482 (N.D.1985) (due process was afforded attorney in disciplinary proceedings where he had notice of disposition of informal complaint and was afforded opportunity to appear before inquiry committee).

Layon also contends that he met the required standard of proving his proper

moral character by a preponderance of the evidence. As previously stated, one of the requirements of Rule 1, N.D.R.Adm. to Prac., is that an applicant be of "good moral character." These same requirements and guidelines are contained in a State Bar Board booklet titled "Statutes and Rules Governing Admission to the Bar."[3] The comments at the end of the "Statutes and Rules Governing Admission to the Bar" indicate that the assessment of an applicant's moral character must be of present character.[4]

Layon contends that all the Board's findings on which it relied for the negative recommendation, relate to Layon's past and are too remote in time to indicate his present moral character. He contends that he has been rehabilitated as indicated by his numerous affidavits of good moral character. Layon cites *Pacheco v. State Bar of California, supra,* 43 Cal.3d 1041, 239 Cal.Rptr. 897, 741 P.2d 1138, in support of his position that he has presented adequate evidence that he is presently of good moral character. In *Pacheco,* the California Committee of Bar Examiners denied Pacheco's certification to the Bar based on his lack of good moral character. The Committee relied on an incident in 1982 when Pacheco counseled a murder witness on how to avoid a subpoena[5] and a 1986 incident when Pacheco, working as a private investigator for an attorney, physically restrained a woman by holding her arm in an attempt to get her to surrender her child. The California Supreme Court reversed the Committee and ordered the certification of *Pacheco,* saying:

> acts involving dishonesty, fraud, deceit or misrepresentation
> abuse of legal process
> neglect of financial responsibilities
> neglect of professional obligations
> violation of an order of a court
> evidence of mental or emotional instability
> evidence of drug or alcohol dependency
> denial of admission to the bar in another jurisdiction on character and fitness grounds
> disciplinary action by a lawyer disciplinary agency or other professional disciplinary agency of any jurisdiction
> "In determining whether the present moral character of an applicant qualifies her or him for a positive recommendation, the State Bar Board will assess the weight and significance of any inappropriate conduct by considering the following factors:
> the applicant's age at the time of the conduct
> the recency of the conduct
> the reliability of the information concerning the conduct
> the seriousness of the conduct
> the factors underlying the conduct
> the cumulative effect of conduct or information
> the evidence of rehabilitation
> the applicant's positive social contributions since the conduct
> the applicant's candor in the admissions process
> the materiality of any omissions or misrepresentations"

---

3. The text of the "Statutes and Rules Governing Admission to the Bar" is identical to the text of this Court's Admission to Practice Rules.

4. The text of the comments at the end of the "Statutes and Rules Governing Admission to the Bar" reads, as follows:
    " * The Admission to Practice rules of the North Dakota Supreme Court require (Rule 1(A)2) that all admittees be of good moral character. Those rules also charge (Rules 3(D), 4(E)) the State Bar Board with the obligation to make a recommendation to the Supreme Court regarding the admission of each applicant, the recommendation to be based in part on the applicant's moral character.
    "The State Bar Board will determine that an applicant's moral character is such as permits a positive recommendation when the applicant's record of conduct indicates that the applicant is presently honest, trustworthy, diligent, and reliable. Those traits in an applicant suggest that the applicant is one who, if otherwise admissible, will properly perform the obligations a member of the bar owes to clients, the courts, opposing parties and counsel, and the public generally. It is the duty of the applicant to supply information sufficient to enable the Board to review the applicant's conduct record.
    "When an applicant's record of conduct includes inappropriate behavior—such as, for example, an instance of any of the items listed below—the State Bar Board will make further inquiry before deciding whether the applicant possesses the good moral character required for a positive recommendation.
    unlawful conduct
    academic misconduct
    making of false statements, including omissions
    misconduct in employment

5. This incident occurred in West Virginia where Pacheco was a licensed attorney.

"Most of the alleged misconduct upon which the Committee based its most recent refusal to certify Pacheco is at least 10 years old. Its value in determining Pacheco's alleged 'present bad moral character' is diminished significantly by its age, and by the absence of similar, more recent misconduct.' ... The issue now is whether his actions since 1982 demonstrate, in light of that former conduct, sufficient evidence of rehabilitation.' "

*Pacheco,* 239 Cal.Rptr. at 901, 741 P.2d at 1142.

The California Supreme Court discounted the child custody incident, rationalizing that the incident was developed by his employer and that the mother was apparently resisting giving up custody pursuant to a valid court order. Based upon this analysis and the 20 letters on Pacheco's behalf, 19 of which were written by lawyers or judges, the California Court concluded:

"His record as a licensed private investigator, his involvement in community projects, and the letters and testimony on his behalf provide a clearer, more accurate picture of his present moral character and rehabilitation than do his offenses from a decade ago upon which the State Bar so heavily relies."

*Pacheco,* 239 Cal.Rptr. at 906, 741 P.2d at 1147.

The California Court in *Pacheco* recognized that:

"In reviewing a denial of certification to practice law, this court may consider any acts or conduct occurring at any time, provided they have a legal tendency to prove the applicant's present conduct. We have, however, recognized that the passage of time lessens the significance of an applicant's misconduct, particularly when that misconduct occurred long before his or her application to the bar." [Citation omitted.]

*Pacheco,* 239 Cal.Rptr. at 905, 741 P.2d at 1146.

The type, number, and recency of types of behavior clearly distinguish *Pacheco* from this case. In this case there is relevant conduct which occurred in 1986 and 1988, which tends to prove the applicant's present moral character. Also, in *Pacheco,* there was no issue as to non-disclosure or omissions in conjunction with the Bar application, as there is in the present case. In this case, the filling out of the application involved both deceptive and false information as close to the present as this Court could expect the Board to be concerned with.

A similar issue was raised in *Application of Mailath,* 752 P.2d 803 (Okl.1988). *Mailath* contended that the conduct upon which the Oklahoma Board of Bar Examiners relied in denying his application for admission was remote, and that only his present moral character should be considered. The Oklahoma Court answered:

"We do not agree. Evidence of an applicant's *prior* conduct may be considered in determining his ethical eligibility, so long as it is not unduly remote in time and hence reasonably relevant to show the present state of his character."

*Mailath* at 811–12.

The conduct relied on by the Board in *Mailath* related to Mailath's position as a certified public accountant. In certain financial matters and partnership dealings, the Court found instances where Mailath actively placed his personal interest above that of the partnerships and his partners and actually misled some of his accounting clients. The Court concluded:

"Evaluating the evidence in light of *all* the roles in which Mailath acted leaves no doubt that he lacks the requisite ethical qualifications for bar admission. Mailath was the personal accountant of at least five individuals who eventually became his partners. He acquired their profound confidence and absolute trust as a result of that pre-existing professional fiduciary relationship. His clients, especially those who had no business or investment experience, were completely dependent upon his advice. He assumed—*vis-a-vis* those clients—the role of accountant, financial advisor, promoter, broker, and, to a limited extent, lawyer, while ignoring completely the highly obtrusive conflicts of interest. The bar

applicant knew some of his clients naively equated his experience as a law-school graduate with that of a seasoned licensed legal practitioner. It is also apparent from the record they relied on his professional *judgment* with the same degree of trust and confidence as that which one would normally place in a lawyer. Mailath's blatant insouciance toward basic tenets of personal ethics makes him a hazard to the public and hence unfit for admission to the bar." [Footnotes omitted.]

*Mailath* at 810–11. Similarly, in the case at hand, certain conduct on which the Board's negative recommendation was made related to deception in financial matters.

█ Layon also contends that the 20 affidavits and letters of recommendation, many of which are from lawyers, judges, and other professional people overcome the Board's evidence in showing his present moral character.

In *Matter of Legg*, 325 N.C. 658, 386 S.E.2d 174 (1989), Legg offered into evidence 17 certificates of his moral character. Legg had been denied admission to the Bar of North Carolina for lack of good moral character based mainly on his non-disclosure and omission in response to several questions on the application. While taking the certificates into consideration, the North Carolina Supreme Court affirmed the denial of admission, concluding:

" 'Material false statements can be sufficient to show the applicant lacks the requisite character and general fitness for admission to the Bar.' ... Where there is a purposeful pattern of omitted material information, the Board may conclude that the applicant has failed in his burden to exhibit candor in his application.

\*　　\*　　\*　　\*　　\*　　\*

"The record and application indicate that Legg exhibited at best an attitude of carelessness and inattention to detail in his practice and his application. Such work habits could prove permanently damaging to any client who might come to rely upon the applicant's professional expertise. Our review of the record reveals no evidence that the applicant accepts personal responsibility for any of the numerous oversights, mistakes and inaccuracies that litter his application and the history of his practice in West Virginia. An applicant who fails to exhibit care in the submission of a document essential to his admission to the practice of his chosen career is unlikely to exhibit any greater degree of care during the course of client representation. In short, the record reveals that Legg fails to show the maturity and professional discipline that is a fundamental attitude of the good moral character required to practice law in this state."

*Legg*, 386 S.E.2d at 182–83.

The Iowa Supreme Court, in assessing such a situation, also concluded:

"Peterson has demonstrated that he has won the support, affection and respect of friends, members of the bar, and employment associates who have written and testified on his behalf. His conduct since release from prison is strong evidence of his desire to be a law-abiding and contributing member of society.

"However, in our determination as to his present moral character, we must recognize the seriousness of his long history of law violations and felony convictions, his assault and battery of Ms. Fong, and his failure to testify truthfully before this court. Without looking beyond Peterson's 1988 testimony, it becomes apparent that his initial descriptions of the 1976 incident as a technical and minor assault were attempts to mischaracterize the incident. This testimony displays a callous and indifferent attitude toward an explosive personal confrontation. When the DCI report and Ms. Fong's letter and affidavit are properly considered, Peterson's attempts to mislead become even more apparent.

"As stated in our order filed August 22, 1980, this court has a responsibility that extends beyond the concepts of what might be best for the applicant's rehabilitation. The court has a responsibility to the citizens of Iowa. We conclude Peterson does not satisfy the re-

quirement of good moral character required of those allowed to take the bar examination."

*Matter of Peterson,* 439 N.W.2d 165, 169 (Iowa 1989).

This Court has had the opportunity to previously deal with a situation in which a bar application was filled out less than truthfully in conjunction with a disciplinary proceeding initiated approximately four years after admission. In *Matter of Howe,* 257 N.W.2d 420 (N.D.1977), Howe, a licensed attorney in North Dakota, was brought before this Court in a disciplinary proceeding. Despite recognizing "a great number of testimonials from clients, friends, and court officials which indicate that he is a competent, considerate and respectful lawyer, who works vigorously and enthusiastically for clients who often find it difficult to find lawyers who will represent them," we found that disciplinary action was necessary. *Howe* at 424. We conclude that the letters of support and testimony on behalf of Layon do not overcome the evidence in this case disclosing present lack of good moral character.

Accordingly, we accept the recommendation of the Board and deny Layon's application for admission to the Bar of North Dakota.

VANDE WALLE and LEVINE, JJ., and VERNON R. PEDERSON and DUANE H. ILVEDSON, Surrogate Judge, concur.

· VERNON R. PEDERSON, Surrogate Judge, sitting in place of MESCHKE, J., disqualified.

DUANE H. ILVEDSON, Surrogate Judge, sitting in place of GIERKE, J., disqualified.

VANDE WALLE, Justice, concurring specially.

I concur in the opinion of the Court. I write separately only to comment upon what might appear to be a dilemma for those applicants to the Bar whose past is less than exemplary and who, if they reveal all, are fearful that their record alone will foreclose admission. They may, therefore, present their past in, if not an untruthful light, at least in the most palliating light, in the hope that their past misdeeds will be overlooked or not thought serious enough to prevent their admission to the Bar.

From my perspective, there should be no dilemma, for although a less than exemplary past must indeed be a major consideration in determining the moral fitness of an applicant to the Bar, I agree that a record indicating the applicant is rehabilitated will ameliorate a record of past indiscretions. But a lack of candor in the application, in a deliberate attempt to mislead us as to that past record, or the making of a feckless statement concerning that past record is, to me, a more significant indication that the applicant does not possess the requisite moral character needed for admission to the Bar. Although "candor to the Court" is no longer a phrase found in the Rules of Professional Conduct, its spirit still lives and it should be a guiding principle for any applicant to the Bar.